Andrew M. Calamari
Lara Shalov Mehraban
Sandeep Satwalekar
Jack Kaufman
Bennett Ellenbogen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0523 (Kaufman)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Civil Case No.** |
| **Plaintiff,**<br>**v.** | **Complaint** |
| **RAYMOND H. BARTON,**<br>**WILLIAM G. GOODE,**<br>**MATTHEW CHARLES BRIGGS,**<br>**KENNETH MANZO, and**<br>**JUSTIN SINDELMAN,** | |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Raymond H. Barton ("Barton"), William G. Goode ("Goode"), Matthew Charles Briggs ("Briggs"), Kenneth Manzo ("Manzo"), and Justin Sindelman ("Sindelman") (collectively, "Defendants"), alleges as follows:

### SUMMARY

1.     This case involves Defendants' multi-million dollar fraudulent scheme in which they acquired shares of several publicly traded companies, made numerous false statements

concerning these companies to inflate the companies' share price, and then sold the stock to the public.

2.      During the period from October 2012 to February 2016, defendant Barton masterminded the scheme, which worked as follows: Barton and Goode acquired the outstanding convertible debt of several public shell companies including MedGen, Inc. (formerly known as Northstar Global Business Services, Inc.) ("MedGen"), Alternaturals, Inc. (formerly known as Premiere Mortgage Services, Inc.) ("Alternaturals"), Manzo Pharmaceuticals, Inc. (formerly known as Fortune Oil and Gas, Inc.) ("Manzo Pharmaceuticals"), and Solpower Corporation ("Solpower") (collectively, the "Issuers"). Barton and Goode — together with defendants Briggs, Manzo, and Sindelman (each of whom served as a chief executive officer for one or more of the Issuers) — then caused the Issuers to issue Barton and Goode unregistered stock.

3.      Contemporaneously with receiving the shares from certain Issuers, Defendants Barton, Sindelman, Briggs, and Manzo intentionally made numerous false public statements concerning certain of the Issuers' business, which were intended to cause the Issuers' stock price to increase. These false statements included untrue claims concerning MedGen and Alternaturals' purported plans to enter the medical marijuana industry, among other matters. In addition, Barton and Manzo caused Manzo Pharmaceuticals to publish misleading press releases concerning purported patent rights and clinical trial results relating to the company's purported "marquee" product.

4.      After many of these announcements, Barton and Goode sold the Issuers' stock to the public knowing that those stock sales were not registered with the Commission, and thus, were illegal absent a valid registration exemption under the federal securities laws. To facilitate

these illegal sales, Defendants knowingly made numerous material false statements to their brokerage firms to convince them that the stock could be legally sold pursuant to a registration exemption.

5.      As a result of their fraud, and through their illegal stock sales, Barton and Goode personally received more than $4.6 million, and Sindelman, Briggs, and Manzo received tens of thousands of dollars in kickbacks.

## VIOLATIONS

6.      Through the conduct alleged herein, Barton, Sindelman, Briggs, and Manzo are liable for violating Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 5 of the Securities Act [17 U.S.C. § 77e], pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

7.      Through the conduct alleged herein, Goode is liable for violating Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2), (3)] and Section 5 of the Securities Act [17 U.S.C. § 77e], pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein.

9.      The Commission also seeks a final judgment ordering Defendants to (1) disgorge their ill-gotten gains, together with prejudgment interest thereon; and (2) pay civil monetary penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Compliant occurred within the Eastern District of New York.  For example, defendants Barton and Goode engaged in numerous of the acts alleged herein in rented office space located in the District, and two of the Issuers (MedGen and Alternaturals) were headquartered in the District during the relevant timeframe.

12.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

**DEFENDANTS**

13.     Raymond H. Barton, age 47, resides in Mount Sinai, New York.  At various times relevant to this action, Barton was the chief executive officer of MedGen, a purported manufacturer of dietary supplements; the chief executive officer and sole owner of Eastlight Enterprises, Inc. (later known as Eastlight Associates, Inc.) ("Eastlight"), a New York corporation; and a founder and managing director of Peachtree Capital LLC ("Peachtree"), a purported financier of microcap companies.

14.     William G. Goode, age 42, resides in East Setauket, New York.  At various times relevant to this action, Goode was the chief executive officer and sole owner of Globe Idol Capital Inc. ("Globe Idol"), a New York corporation, and a founder and managing director of Peachtree.  At all relevant times, Goode was also a practicing New York-licensed attorney.

15.     Justin Sindelman, age 33, resides in Island Park, New York.  Sindelman served as the chief executive officer of MedGen from 2014 to 2015.

16.     Matthew Briggs, age 27, resides in Centereach, New York.  He became the chief executive officer of Alternaturals in 2014.  In 2015, upon MedGen purchasing the assets of Alternaturals, Briggs became the chief executive officer of MedGen.

17.     Kenneth Manzo, age 47, resides in Shohola, Pennsylvania.  Manzo is a licensed pharmacist and, until recently, served as the chief executive officer of Manzo Pharmaceuticals, a developer and manufacturer of dietary supplements.

**FACTS**

**A.     Barton's Control of MedGen and Issuance of Convertible Notes**

18.     In or about February 2010, Barton sold his private business—Northstar Business & Property Brokers, Inc.—to MedGen, a dormant public company that previously had been a manufacturer and distributor of dietary supplements, in exchange for preferred shares of MedGen.  The preferred shares gave Barton voting control of MedGen, which Barton used to appoint himself as the sole director and chief executive officer of the company.

19.     Barton conducted no legitimate business through MedGen, but used it to further his fraudulent securities scheme and thereby enrich himself and others involved in that scheme.

20.     While MedGen's CEO, Barton caused the company to issue two promissory notes to himself—a $62,000 note dated February 23, 2010, and a $16,000 note dated March 3, 2010.

The promissory notes were "convertible," meaning that the holder could elect to receive MedGen stock in lieu of cash repayment (in this case, the promissory notes could be converted into a total of 68 million MedGen shares). At the time, MedGen's stock traded over-the-counter on the OTC Pink Open Market under the ticker symbol "MDIN."

21.     By September 2011, Barton purportedly had resigned as CEO and sole director of MedGen and was replaced as CEO by another individual. The new CEO, however, held the position in name only; Barton continued to manage and otherwise control the company.

22.     On September 1, 2011, Barton caused MedGen to issue him a $78,000 convertible promissory note that consolidated the two previous notes the company had issued him (the "Consolidated MedGen Note"). The Consolidated MedGen Note, purportedly signed by the nominal CEO, provided that Barton could convert the debt into shares of MedGen stock at a rate of $0.0001 per share. This provision effectively increased the number of shares Barton could demand from MedGen from approximately 68 million to 780 million.

**B.     MedGen's False Public Statements**

23.     From approximately October 2012 to February 2016, Barton engaged in fraudulent promotional activity for MedGen, routinely causing the company to disseminate to the public false information intended to create the impression that MedGen was a legitimate, even thriving, business. The false and misleading public statements were intended to, and sometimes did, increase MedGen's stock price. In each case, Barton knew or recklessly disregarded that the MedGen press releases were false and misleading.

24.     The press releases and other public statements generally created the false impression that MedGen had resumed its original dietary supplement business from the 1990s and was poised for success. For example, the first false press release, which Barton drafted and

issued on October 23, 2012, stated that the company "has taken a tremendous leap forward in re-introducing it's [sic] nationally recognized product line into traditional and online retail by 2013." The release further described the company's efforts to "put[ ] its products on the shelves" in major retail chain stores (e.g., "Walmart"), and projects that "sales for the first year are above 5 million units but exact order amounts will be announced in the coming weeks."

25.     As Barton knew at the time, the October 23 press release was false and misleading because MedGen had no reasonable prospect of selling its products through major retailers or achieving sales anywhere near five million units.

26.     Two days later, on October 25, 2012, Barton converted $3,400 of the Consolidated MedGen Note into 34 million shares of MedGen stock. Shortly thereafter, Barton deposited these shares with a broker and sold them to the public.

27.     Barton simultaneously assigned an additional $3,400 of the Consolidated MedGen Note to Globe Idol, the corporate alter ego of defendant Goode. Goode was a former colleague of Barton's from years earlier. Goode converted that debt into an additional 34 million MedGen shares, which he also deposited with a broker and sold.

28.     For more than a year thereafter, Barton knowingly or recklessly drafted and issued additional false and misleading MedGen press releases while he and Goode continuously converted purported MedGen debt into stock and sold it to the public.

29.     On May 29, 2013, Barton drafted and caused MedGen to issue a press release announcing that the company had "acquire[d] a new and exciting patent license" for a probiotic to treat "lactose intolerance" (the "Probiotic Patent"). The press release claimed that "[a] single dose of the product produced using this patented method would basically change the person's digestive system's behavior to that of someone without lactose intolerance for up the three

7

months at a time." The press release further stated, "The Company assures shareholders that neither precious capital, nor free-trading equity were used to solidify the patent's use. Instead, in order to avoid dilution or a shortfall of capital needed to fund inventory, a deal was struck using restricted shares with lock up periods in addition to a year as to avoid damage to the tight share structure the company has worked so hard to create."

30.     The statements in the May 29 MedGen press release were false. First, MedGen did not obtain any meaningful patent rights from the product's inventors. Rather, Barton purported to enter into a non-binding patent agreement with the patent owners, which was terminable at will by either side. Second, at the time of the press release, MedGen had not created any such product, and there was no basis for product efficacy claims. Third, contrary to the press release, the company secured the non-binding agreement in exchange for unrestricted, freely tradable shares.

31.     Barton knew that the statements in the May 29 press release were false when he issued it because he personally had participated in the transaction and was familiar with the transaction's actual terms.

32.     In or about October 2013, Barton and Goode formed and incorporated Peachtree, which they publicly described as a "next generation small-cap private equity fund and venture capital firm." In reality, the sole purpose of the company was to serve as Barton and Goode's alter ego for acquiring and originating additional convertible MedGen debt (and other public-company debt) that Barton and Goode could liquidate. After forming Peachtree, Barton and Goode split the proceeds of their stock sales evenly.

33.     After founding Peachtree, Barton continued his fraudulent promotion of MedGen. On February 19, 2014, Barton drafted and issued a press release announcing that MedGen had

reduced its outstanding convertible debt—*i.e.*, the convertible debt that Barton and Goode held. The press release falsely stated that the company's outstanding debt had been reduced to less than $30,000, and that the debt's flat conversion rate (of $0.0001 per share) had been adjusted to float with the underlying stock's market price. In fact, Barton and Goode, the only MedGen debt holders, had not agreed to any reduction in the outstanding debt, and they continued to convert their debt into MedGen stock at a flat rate of $0.0001 per share after MedGen issued the press release.

34.      In the weeks following the February 29 press release, Barton sold an additional 50 million unregistered MedGen shares to the public.

35.      In June 2014, Barton hired Justin Sindelman as MedGen's new CEO. Barton and Sindelman had an understanding that Sindelman would receive a salary for running MedGen— and that Barton and Goode, through Peachtree, would continue to fund the company—as long as Sindelman regularly issued press releases and engaged in other activities to increase the market price of the company's stock.

36.      From June 2014 to early 2015, Sindelman, with Barton's assistance, knowingly or recklessly drafted and caused MedGen to issue false and misleading press releases and other public statements, and he ultimately received a salary in excess of $50,000 from MedGen.

37.      Sindelman issued his first false and misleading press release on June 5, 2014. The press release announced that MedGen had "signed" "manufacturing and distribution deals" for a medical marijuana product to be called Snorenz Medicated. The product was to be a THC-infused version of Snorenz, an anti-snoring throat spray the company had marketed years earlier, before the takeover by Barton. The press release referred to an "executed agreement" between MedGen and Kush Creams, a well-known Washington state medical marijuana company. It

stated that Kush Creams would be "starting a significant manufacturing run immediately, in order to have enough inventory for the initial orders." The press release continued, "It is expected that approximately a hundred dispensaries will start out carrying Snorenz Medicated, and that number is expected to grow significantly as the product begins to capitalize on Snorenz's existing brand awareness."

38.     As Sindelman knew or recklessly disregarded, contrary to the June 5 press release, there was no "executed agreement" between MedGen and Kush Creams.

39.     Furthermore, prior to the June 5 press release, Kush Creams had told Sindelman it would manufacture and distribute 500 units of Snorenz, but only under very specific terms and conditions that had not been fulfilled. These terms required MedGen to pay Kush Creams $5,000 before production began and an additional $5,000 after Kush Creams produced the 500 units. Moreover, Kush Creams would not distribute the product unless and until it received the full $10,000. In addition, MedGen was required to pay Kush Creams $8 per ounce of Snorenz that Kush Creams infused with THC. Sindelman knowingly or recklessly failed to disclose any of these terms in the June 5 press release. Sindelman also failed to disclose that, at that time of the press release, MedGen lacked sufficient funds to pay, and had no intention of paying, the $10,000 required by Kush Creams to distribute the product.

40.     In addition, as Sindelman knew, the June 5 press release's statement that "a hundred dispensaries will start out carrying Snorenz Medicated" was false. In fact, in an email sent the day before he issued the press release, Sindelman admitted to the owner of Kush Creams that the projection overstated the number of dispensaries that would carry the product at launch: "[W]e mention 'approximately a hundred dispensaries' but understand that it will probably [be] less to start."

41.     MedGen never paid Kush Creams the full required $10,000 up-front payment, and distribution of the product never began. Subsequent to the June 5 press release, MedGen and Kush Creams agreed to sell only a limited quantity of Snorenz Medicated at a marijuana festival.

42.     On November 13, 2014, Sindelman publicly announced that a well-known entrepreneur ("Entrepreneur") had been appointed as "Co-Chairman of the [B]oard of Directors" and would help the company with its "rapid expansion throughout the U.S. and Asian markets." A subsequent press release drafted by Sindelman and Barton and issued on December 17, 2014, also falsely referred to the entrepreneur as the "[n]ew Co-Chairman."

43.     On January 9, 2015, Sindelman disseminated additional information about the Entrepreneur's involvement with the company in a letter to shareholders that he authored and posted on the company's website.  The shareholder letter projected that deals being negotiated by the Entrepreneur could result in "a relatively hands off revenue stream, which is projected to be in the million dollar range this year alone, with a five year forecast bringing the sums up to several million dollars annually."

44.     These statements regarding the Entrepreneur were false and misleading.  The Entrepreneur had not actually been appointed co-chairman of the board; Sindelman remained the sole chairman of the board.

45.     Moreover, Sindelman, who personally had negotiated the terms of the Entrepreneur's involvement with the company, knew, but failed to disclose, that the Entrepreneur's services, and any additional revenue to MedGen derived from them, were contingent upon the company's issuing the Entrepreneur a significant number of shares.  In an email sent to Barton the day before the January 9 investor letter, Sindelman emphasized he did not intend to issue the shares to the Entrepreneur up front: "I don't want to authorize the issuance

until I see SOMETHING from [the Entrepreneur]."  In fact, Sindelman never intended to issue the shares and took no steps to issue them.

46.     All told, the Barton and Goode obtained total proceeds of $2,150,621 from their sales of MedGen stock, with more than $150,000 in proceeds during Sindelman's tenure as CEO.

**C.     Barton's Control of Alternaturals and the Alternaturals Note**

47.     In late 2013, Barton acquired voting control of Premier Mortgage Services, Inc. ("PMRS").  PMRS, a defunct mortgage servicer, was a public shell company without any significant assets or ongoing operations.  After Barton acquired control of the company, he and Goode renamed it Alternaturals.

48.     After gaining control of Alternaturals, Barton installed a nominee CEO for the company, and Barton exercised all the powers of CEO (sometimes even impersonating the nominee CEO to do so).

49.     At the same time, Barton and Goode each acquired—through their corporate alter egos, Eastlight and Globe Idol Capital—a 50 percent interest in a purported $150,000 convertible promissory note previously issued by the company (the "Alternaturals Note").

50.     Barton and Goode knew, or were reckless in not knowing, that the Alternaturals Note was not authentic.  The Alternaturals Note purportedly was issued on October 31, 2009 to a third-party lender corporation.  That lender, however, did not actually exist until March 2010.  Furthermore, the Alternaturals Note purportedly was notarized in Texas by a "Mary Houser," but public records indicate that no such notary existed in Texas at that time.  Also, the purported "Mary Houser" notarization states that Ms. Houser's commission was to expire in December 2015, an impossibility given that Texas notary commissions last only four years (the notarization

12

was dated October 2009, more than four years prior to the purported December 2015 expiration date).

**D.    Alternaturals' False Press Releases**

51.    In early 2014, Barton knowingly caused Alternaturals to issue a series of false and misleading press releases concerning the company's purported entry into the medical marijuana industry, while he and Goode simultaneously sold unregistered shares of the company's stock to the public.  Barton knew that the press releases were false because he controlled the company (which was located in office space he rented and occupied); and he thus knew that the company had no employees (aside from its nominal CEO) and no actual operations.

52.    On March 24, 2014, Barton drafted, and caused the company to issue, a press release announcing that the defunct mortgage servicing firm would be changing its name to Alternaturals and "will be releasing a product line consisting of hemp, medical marijuana, and many natural substances as alternatives to prescription drugs."  The press release noted that "several" of the "products harness the many positive properties of Cannabis or Hemp, more widely known as marijuana," and that "some of these products contain THC, the active ingredient in marijuana that causes intoxication."

53.    The March 24 press release was false.  At that time, Alternaturals was not developing any marijuana products.

54.    On March 31, just a week later, Barton drafted and caused Alternaturals to issue a press release announcing its "plan . . . to become the premier distribution company for the entire alternative healthcare product, and medical marijuana industries."  The press release further stated that the company was "in the final stages of creating the product catalog and shipping logistics" and boasted an "[e]xtensive database driven ordering system" that it would use to

"keep track of the various state laws, which product manufacturers are in which states, as well as inventory, purchase orders, and shipping logistics." Finally, the press release announced that the company "plans to begin releasing [its] products in the next 30-45 days," including first "the alter ego of 5-hour energy with a marijuana spin, and a hemp nutritional bar that will come in THC and non-THC versions."

55.     All of these statements in the March 31 press release were false. The company had no plans to become a distributor to marijuana dispensaries; the database described in the press release did not exist; and the company was not developing the products described.

56.     On April 10, 2014, Barton prepared and caused Alternaturals to issue another false and misleading press release. This press release provided additional details on one of the marijuana-containing products that was referenced in the prior press release:

> Lastly, one of the company's most anticipated products, and one which Alternaturals believes will be the most used non-smoke marijuana products in the world is a 2oz liquid THC shot called 5 Hour High™. Formulated to enter the body though the cells and membranes in the mouth and throat but also to be digested, people consuming 5 Hour High™ will experience the effects of the marijuana fairly quickly, and those effects will last up to five hours, making 5 Hour High™ the most effective, easy to use, and convenient marijuana product in the world. 5 Hour High™ will only be sold in legally licensed dispensaries, in states where marijuana is legal, but it has the promise of being one of the companies [sic] most profitable products.

57.     None of this information in the April 10 press release was true. The product had not been formulated, the claims about the product's efficacy were unfounded, and there were no plans to sell it in dispensaries.

58.     On May 22, 2014, Barton prepared and caused Alternaturals to issue yet another false press release. This one falsely stated that "there are distribution deals in place that will have its highly anticipated medical marijuana product, five hour high, hitting dispensary shelves in as little as four weeks." In fact, no such deals were in place, and the product did not exist.

14

59.     Finally, on June 5, 2014, Barton prepared and caused Alternaturals to issue a press release stating "that it has chosen Kush Creams, a Washington based, medical marijuana grower and distributor with award winning strains and products, to manufacture and distribute its long awaited medical marijuana product, 5 Hour High©." The press release further quotes Alternaturals' nominal CEO as stating, "We are extremely excited to be working with Kush Creams on this project . . ." However, there was no agreement or understanding between Alternaturals and Kush Creams, and Kush Creams never took any steps to produce or manufacture Alternaturals' purported product.

60.     At various times after the press release was issued, Kush Creams received inquiries about the product and denied it was working with Alternaturals on 5 Hour High.

61.     After Barton began issuing the above Alternaturals press releases in March 2014, the company's stock price rose from under 10 cents, where it had been trading for months, to as high as $1.26 on March 28, and peaking again at $1.12 on May 23. Starting just before the first of those press releases, and continuing through October 2014, Barton and Goode converted the Alternaturals Note into 750 million shares of Alternaturals common stock and sold those shares to the public for more than $1.8 million.

62.     In or about August 2014, Barton fired the nominal CEO and hired Defendant Briggs to replace him. Briggs, however, viewed himself as working solely for Peachtree (not Alternaturals) and viewed Barton as controlling Alternaturals. Briggs summarized this arrangement in a later email to Barton:

> I view myself as an employee of Peachtree. On the Peachtree Team.
>
> You assign me to run a specific company. My job is to legally sign documentation so that you can convert shares, and to create press releases so that you can sell them. My job can be eliminated at any time, at your discretion. If the companies make money, I can take some of it. I'm not sure how this differs from being an employee or on the Peachtree Team.

15

63.    In a September 16, 2014 email, consistent with his controlling role at Alternaturals, Barton instructed Briggs to issue sensational public statements regarding Alternaturals to pump up the stock price.  He encouraged Briggs to "look[ ] at other companies on the OTCMarkets.com site … look at their charts and look for the spikes…then look at what news they put out around that time and you will get a good idea of what works."  Barton continued, "Honestly its [sic] more sensationalism than real solid business…. [Y]ou have to engage in a little Enquirer type news to get the funding you need to make the real deals."

64.    Again consistent with Barton's controlling role at Alternaturals, on February 3, 2015, Briggs sent Barton a draft Alternaturals shareholder letter with the following cover note seeking Barton's approval:

> Within the letter I needed to address 5-Hour High.  The lack of development with it is absolutely murdering our share price. I still receive emails in reference to it. There are many current shareholders that bought due to it's [sic] announcement. The other developments will be good for the share price, but I think getting something to materialize with it will really get things going.  We have encountered an issue with it.  Megan from Kush Creams has never responded to my emails initially and also has been dodging Justin [Sindelman]'s communications (they have some sort of business deal going on with Snorenz.) From my understanding she has basically told shareholders in some way, shape, or form that they are no longer doing it.  She never told us this first (she isn't communicating back) and it's pretty terrible for her to do that publicly.  So the letter addresses that we are trying to work with other companies to partner up to get it going.  I just need to get the share price to recover.  I feel like shit looking at a 12 month view and seeing a negative trend.

65.    Later that same day, Briggs posted the letter he had sent to Barton on the Alternaturals website and disseminated a link to it using Alternaturals' Twitter account.  The letter referred to Kush Creams' lack of involvement with the company as merely a temporary "setback," stating:

> This deferment has only yielded greater opportunity. We currently stand at a substantially stronger position, with even more attractive opportunities on the horizon. Serious headway has gone towards pinpointing a more

suitable manufacturing partner. This also comes with the opportunity to negotiate even more attractive terms.

A few qualified and able candidates have been identified; once plans become solidified there will be an official announcement. Updates in reference to our other exciting developments are soon to follow.

We're going to catapult 5-Hour High to distribution.

Your patience will yield prosperity.

66.     The February 3 shareholder letter was false and misleading.  In fact, as Barton and Briggs were both aware, Alternaturals had not identified any alternative partners to distribute and manufacture its purported product and had not even attempted to do so.

67.     Later in February, Barton and Goode attempted to convert additional shares from the Alternaturals Note, but were unable to do so because the company's stock transfer agent became suspicious of the authenticity of the Alternaturals Note.

68.     In May 2015, Barton sent Briggs an email proposing that Alternaturals register a trademark for 5 Hour High.  Barton told Briggs that he "need[ed] the stock to run"—*i.e.*, increase in price—and that "if we pull out $100K [in proceeds from stock sales], I can drop you $25k to $35K."  Soon thereafter, Briggs applied for the trademark with the U.S. Patent and Trademark Office ("PTO"), using his personal funds to pay the application fee because the company did not have sufficient cash to do so.

69.     On August 6, 2015, with the trademark application pending, Briggs and Barton prepared and issued an Alternaturals press release falsely announcing "the registration of a US Trademark for the highly anticipated MMJ product 5-hour high" and further falsely stating that the company will license 5 Hour High to existing manufacturers of medical marijuana products.

70.     The August 6 press release was false and misleading.  The PTO had not yet acted on the application Briggs had filed in May, much less granted the registration.  When they issued

the press release, Briggs and Barton knew that the application for the trademark still was pending, and they knew or recklessly disregarded that the PTO might deny the trademark application, which, in fact, the PTO later did (on August 31, 2015).

71.     On September 29, 2015, after he learned of the PTO application denial, Barton emailed Briggs that "the trademarking of [5 Hour High] was always a publicity stunt so in the end we don't really need a trademark acceptance..." Alternaturals issued no public statement announcing the PTO's trademark denial or correcting its false August 6 press release.

72.     On or about September 15, 2015, Barton and Goode unsuccessfully attempted to deposit shares they obtained by converting Alternaturals debt, but were unable to do so because the brokers questioned the legality of the sales.

73.     Faced with an inability to liquidate their Alternaturals shares, Barton, after consulting with Goode, caused MedGen to acquire Alternaturals assets in exchange for assuming all of its debt.  After the transaction, Briggs became the CEO of MedGen.

74.     Thereafter, Barton and Goode obtained more shares of MedGen to capitalize on the false news about the 5 Hour High trademark.

75.     On September 22, 2015, in a press release prepared and issued by Barton and Briggs, MedGen announced that it had acquired the assets of Alternaturals.  Notwithstanding the August 31 trademark denial, the press release falsely stated that Alternaturals had a "pending trademark for '5 Hour High.'"  The press release omitted any mention of the prior trademark denial and did not disclose that the company had neither appealed nor planned to appeal the trademark denial.

**E.**  **Manzo Pharmaceuticals, Inc.**

76.     In June 2014, Barton and Goode, through Peachtree, arranged a reverse merger to help raise capital for Manzo Pharmaceuticals LLC, a privately held company owned by Barton's longtime acquaintance Manzo.  Barton and Goode offered Manzo the opportunity to merge the company into Fortune Oil and Gas, Inc. ("FOGC"), a public shell company that Barton and Goode controlled, and promised Manzo ongoing funding.  Manzo agreed to sell his company to FOGC in exchange for voting control over the resulting public company.  Manzo then appointed himself CEO and changed the name of the company to Manzo Pharmaceuticals.  After the merger, Peachtree loaned Manzo Pharmaceuticals $40,000 in exchange for a convertible promissory note in the same amount.

77.     After loaning $40,000 to Manzo Pharmaceuticals, Barton and Goode—who previously had acquired all of FOGC's outstanding debt—held over $300,000 in Manzo Pharmaceuticals convertible debt.

**F.**  **Manzo Pharmaceuticals' False Press Releases**

78.     Barton and Manzo had an understanding that Manzo Pharmaceuticals would receive additional funding from Peachtree if Barton and Goode were able to profitably liquidate their convertible debt.  Thus, Manzo understood that Manzo Pharmaceuticals' funding was directly related to Barton and Goode's ability to sell their Manzo Pharmaceuticals securities.

79.     On multiple occasions, Manzo issued false and misleading press releases prepared by Barton that were designed to inflate Manzo Pharmaceuticals' stock price.

80.     Several of the Manzo Pharmaceuticals press releases gave the false impression that the company was the exclusive owner of the Probiotic Patent and was poised to market a product based on it called Lacto-Freedom.

19

81.    For example, on January 6, 2016, Manzo issued a press release, which Barton drafted at Manzo's request, announcing that the "patent rights" for the Probiotic Patent had been transferred to Manzo Pharmaceuticals from a subsidiary.

82.    The January 6 press release, as well as over ten other press releases issued by Manzo Pharmaceuticals, gave the false impression that Manzo Pharmaceuticals owned the Probiotic Patent.  These press releases fraudulently failed to disclose that:  (1) 50 percent of the patent rights were held by the Probiotic Patent's co-inventor (the "Co-Inventor"), not Manzo Pharmaceuticals; and (2) the Co-Inventor (who was not affiliated with Manzo Pharmaceuticals) had exclusive physical possession of the Lacto-Freedom probiotic strain (the existence of which Manzo had never verified).  The Co-Inventor's ownership of 50 percent of the Probiotic Patent, and his exclusive possession of the probiotic strain, was material information because the company could not license the patent or sell its related purported product ("Lacto-Freedom") without the Co-Inventor's consent and cooperation.

83.    Manzo and Barton both knew that Manzo Pharmaceuticals did not exclusively own the Probiotic Patent or possess the strain.  Indeed on June 29, 2015, Barton proposed to Manzo that they trick the Co-Inventor into signing over some of his rights to Manzo.  Specifically, Barton suggested in an email that they fabricate a story that a large drug company was interested in licensing the patent, but that company would deal only with Manzo and would not negotiate unless they were assured that there was only one decision-maker.

84.    In emails on July 15, Barton and Manzo also secretly planned ways to obtain a sample of the Lacto-Freedom strain from the Co-Inventor:

> Manzo:    Unfortunately, I do NOT have the product and he has never given it to me although I asked for it in the past.... If I had the product I COULD do everything else, but I do not.... [S]uppose a company interest[ed] in licensing it requested a sample for them to examine, if he would fall for that.

20

> Barton:      We could try making a fake website as a distributor/lab etc. and try to get samples.  But you don't even know if he really made it in the first place… That's fucked up, he may have never made anything and the results may be just fabricated…

85.    Several months later, Manzo and Barton discussed having Briggs, who by then had become the CEO of MedGen, request a sample of the strain from the Co-Inventor.  Manzo wrote to Barton, "He [the Co-Inventor] won't suspect anything if it's medgen [sic] and the website is posted and it's convincing."

86.    In addition to misrepresenting that the company owned and possessed Lacto-Freedom, Manzo and Barton misrepresented data from a clinical trial the Co-Inventor was conducting on Lacto-Freedom.  On February 8, 2016, while a clinical trial regarding the efficacy of Lacto-Freedom was ongoing, Manzo emailed Barton that he had obtained positive results from three trial participants and asked Barton to write a "good short [press release] about the results."  Manzo had obtained the results directly from the participants, without the Co-Investor's knowledge.  Manzo also informed Barton that he had obtained a pill from one of the participants and intended to proceed with manufacturing.  He wrote, "We do NOT need the pure culture from [the Co-Inventor]."

87.    Days later, on February 16, 2016, Manzo issued a press release that Barton authored.  The press release announced that "[a]ll of the participants [in the clinical study] were able to eat and drink dairy products with no symptoms at all just 10-14 days after taking Lacto-Freedom™ for only 7 days.  Two-thirds of the participants had no symptoms at all for a period of approximately two months after taking the probiotic, and one-third of the participants had no symptoms whatsoever well after three months."  Contrary to these representations, these results did not reflect the results of "all of the participants" but, rather, only the three participants from whom Manzo had obtained results.

88.     On March 24, 2016, Manzo issued a second press release, also drafted by Barton, restating the same misleading information contained in the February 16 press release.

89.     At the same time that Manzo Pharmaceuticals issued the above misleading press releases, Barton, Goode and Peachtree converted their Manzo Pharmaceuticals debt into unregistered Manzo Pharmaceuticals stock and sold them to the public.  All told, between June 2014 and March 2016, Barton and Goode generated over $493,000 by selling 981 million shares of Manzo Pharmaceuticals stock.

**G.     Unregistered Distributions and Misrepresentations to Brokers**

90.     Barton and Goode sold a total of billions of unregistered common shares of MedGen, Alternaturals, Manzo Pharmaceuticals, and Solpower (Solpower has been known at various times as Bitcoin Collect, Inc. (ticker: BTCC), Good Vibration Shows, Inc. (ticker: GVSI), and Long Beard Breweries, Inc.).  The table below summarizes the number of shares sold and the proceeds obtained:

| Issuer | Shares Sold | Total Proceeds |
| --- | --- | --- |
| MedGen | 2,170,000,000 | $2,150,621 |
| Alternaturals | 750,000,000 | $1,881,780 |
| Manzo Pharmaceuticals | 981,000,000 | $493,447 |
| Solpower | 19,508,922 | $479,509 |

91.     No registration statement had been filed with the Commission (or was otherwise in effect) with respect to any of Defendants' sales of MedGen, Alternaturals, Manzo Pharmaceuticals, or Solpower stock.

92.     The Securities Act of 1933 prohibits the unregistered sale of securities, unless an exemption applies.  Commission Rule 144 provides a safe harbor for sales meeting certain criteria.  None of the sales identified in paragraph 90, above, satisfied the Rule 144 criteria.

93.     To sell their Issuer stock, Defendants first needed to deposit it at brokerage firms (the "Brokers").  As a condition of accepting such deposits, the Brokers required Defendants to make certain representations relevant to Defendants' ability to lawfully engage in such unregistered stock sales.  To induce the Brokers to accept a deposit of the securities, Barton, Goode, Manzo, Sindelman, and Briggs intentionally made false statements to the Brokers to mislead them into believing that Defendants lawfully could sell their shares pursuant to the Securities Act Rule 144 safe harbor.

### 1.  Misrepresentations as to Affiliate Status

94.     The Rule 144 safe harbor severely restricts unregistered sales by affiliates of the issuer.

95.     At all relevant times, Barton and Goode were affiliates of all the Issuers.  By virtue of their convertible debt positions, they had complete control over the Issuers.  As Barton explained in an email to Manzo:

> All these notes [i.e., Manzo Pharmaceuticals and the other Issuers' notes held by Barton and Goode] can be foreclosed on and basically the entire note is converted giving us (or our assignee) enough shares to be 75% or 80% shareholder.  We take control of it and then give the shares back to the company in exchange for a new debt note.  We foreclosed on [two other issuers] in the past few months….

96.     Barton also controlled MedGen's and Alternaturals' preferred shares, giving him majority voting rights over those Issuers.

97.     In connection with all of the securities sales identified in paragraph 90, above, in order to avoid the stricter criteria applicable to affiliates, Barton and Goode falsely represented to brokers that they were not affiliated with the Issuers.

23

98.     Sindelman, Briggs, and Manzo were aware, at a minimum, that Barton enjoyed *de facto* control of the Issuers.  Nonetheless, each of them also falsely represented in letters to the Brokers that Barton and Goode were not currently affiliated with the Issuers.

99.     Sindelman and Briggs further falsely represented to the Brokers that Barton "ha[s] never been affiliated with" MedGen, even though they knew Barton previously had been the company's CEO.

100.     Sindelman, Briggs, and Manzo also falsely represented to the Brokers that Barton and Goode "have not been given access to any information that has not been previously publicly disseminated" (a factor tending to negate an affiliate relationship).  Sindelman, Briggs, and Manzo knew those representations were false because they all had discussed non-public information with Barton and/or Goode.

### 2.     Misrepresentation as to Provenance and Ownership of Shares

101.     In October 2013, a Broker that had accepted some of Barton's MedGen deposits learned that Barton previously had been MedGen's CEO, a fact that Barton had concealed from the Broker.  After learning of Barton's former role as CEO, the Broker closed Barton's account. In December 2014, before Barton was able to establish an account in his own name with a new broker, Barton recruited Manzo to sell MedGen shares on his (Barton's) behalf.  Barton converted a portion of the $78,000 MedGen Note into 50 million MedGen shares and then executed a sham agreement with Manzo purportedly to sell those shares to him.  In fact, however, no such sale took place or was intended.

102.     Manzo deposited the 50 million shares in a brokerage account in his name.  To establish that he owned the shares, Manzo gave the broker a copy of the sham Barton-Manzo sale agreement and the check for the purported purchase price made out to Barton (which had

neither been sent to Barton; nor cashed).  Manzo failed to disclose to the broker that Barton had an ongoing ownership interest in the shares.

103.   Once the shares were deposited, Manzo sold them for over $60,000 and then paid Barton $31,000 out of those funds.  To disguise this kickback arrangement, Barton and Manzo used a second sham agreement, under which Barton purported to agree to provide consulting services to Manzo in exchange for the $31,000.  Barton never provided such services, and he and Manzo never intended that he do so.

### 3.   Misrepresentations of Holding Periods

104.   To avail themselves of the Rule 144 safe harbor, Barton and Goode also had to establish that they had held their shares for more than a year prior to their proposed stock sales. As applied to convertible promissory notes, the Rule 144 one-year holding period begins on the note's original issuance date.  To create the appearance of compliance with this rule, Barton and Goode repeatedly told the Brokers that their convertible debt had been issued more than a year earlier.  These representations often were false.

105.   For example, certain of the MedGen notes that Barton and Goode converted to stock already had been repaid in full prior to the conversion (the "Satisfied Notes").  Thus, at least by the time of those conversions, the purported promissory notes were fictional (i.e., they held no value and no longer could be converted to stock).  Thus, in those instances, Barton and Goode could not legitimately claim that they had held MedGen securities for more than a year; rather the holding period ran from the date MedGen issued them stock, which was just days before Barton and Goode deposited the stock with the Brokers.

106.   From 2014 to 2016, Goode prepared four new MedGen convertible notes purportedly issued to Eastlight and Globe Idol.  Those notes were backdated to make it appear as

though MedGen had issued them earlier (the "Backdated Notes").  Barton and Goode converted

debt from the Backdated Notes and deposited the shares for sale with the Brokers.

107.    Barton and Goode falsely represented to the Brokers that they had held the

Backdated Notes from the dates stated on the notes (i.e., more than one year).  In fact, they had

held the Backdated Notes only from the date the note had been issued to them, which, at the time

of the relevant deposits, was less than one year.

108.    Barton and Goode's Alternaturals stock sales all involved stock converted from

the Alternaturals Note, which was a forgery.  Thus, those conversions were not legitimate, and

the Barton and Goode had held the securities only from the share issuance date (which was only

days before the deposits with the Brokers).

### 4.  Misrepresentations of Non-Shell Status

109.    To the extent any of the Issuers ever had been a "shell" company, additional Rule

144 criteria applied.  A "shell" company is one that has either no or nominal operations, and

either no or nominal assets (other than cash and cash equivalents).

110.    As Barton and Goode knew at the time they sold the Issuers' shares, MedGen,

Alternaturals, Manzo Pharmaceuticals, and Solpower all had been shell companies.  Barton and

Goode nonetheless falsely told the Brokers that these Issuers had never been shell companies.

111.    Sindelman, Briggs, and Manzo also certified to the Brokers that MedGen,

Alternaturals, and/or Manzo Pharmaceuticals were not shell companies, a fact which they either

knew or recklessly disregarded was false.

## FIRST CLAIM

### Barton, Sindelman, Briggs, and Manzo Violated
### Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5

112.    The Commission realleges paragraphs 1 through 111, above.

113.    Barton, Sindelman, Briggs, and Manzo each violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

114.    Between October 2012 and February 2016, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

## SECOND CLAIM

### Barton, Sindelman, Briggs, and Manzo Violated
### Sections 17(a)(1), (2) and (3) of the Securities Act

115.    The Commission realleges paragraphs 1 through 111, above.

116.    Barton, Sindelman, Briggs, and Manzo each violated Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

117.    Between October 2012 and February 2016, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge, recklessness or negligence: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices

27

or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities being offered or sold.

### THIRD CLAIM

### Goode Violated Securities Act Sections 17(a)(2) and (3)

118.   The Commission realleges paragraphs 1 through 111, above.

119.   Goode violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

120.   Between October 2012 and February 2016, Goode, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge, recklessness or negligence: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (b) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities being offered or sold.

### FOURTH CLAIM

### Barton, Goode, Sindelman, Briggs, and Manzo
### Violated Section 5(a) and (c) of the Securities Act

121.   The Commission realleges paragraphs 1 through 111, above.

122.   Barton, Goode, Sindelman, Briggs, and Manzo each violated Section 5 of the Securities Act [17 U.S.C. § 77e(a) & (c)].

123.   Between October 2012 and February 2013, these defendants, directly or indirectly, and notwithstanding the fact that there was no applicable exemption: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the

mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to

be carried through the mails or in interstate commerce, by means or instruments of

transportation, securities as to which no registration statement was in effect; and/or (c) made use

of means or instruments of transportation or communication in interstate commerce or of the

mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to

which no registration statement had been filed.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that Barton, Goode, Briggs, Manzo

and Sindelman each violated the federal securities laws and Commission rules as alleged in this

complaint;

### II.

Permanently enjoin Barton, Briggs, Manzo, and Sindelman from violating Sections 5(a)

and (c) and 17(a)(1), (2), and (3) of the Securities Act and Section 10(b) of the Exchange Act and

Exchange Act Rule 10b-5;

### III.

Permanently enjoin Goode from violating Sections 5(a) and (c) and 17(a)(2), and (3) of

the Securities Act;

### IV.

Order Barton, Goode, Briggs, Manzo, and Sindelman to disgorge all illegal trading

profits, commissions, fees, payments and other ill-gotten gains that they obtained as a result of

their fraudulent misstatements, acts or courses of conduct described in this complaint, and to pay

prejudgment interest thereon;

## V.

Order Barton, Goode, Briggs, Manzo, and Sindelman to pay civil monetary penalties

pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78 u(d)(3)];

## VI.

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6)

of the Exchange Act [15 U.S.C. § 78 u(d)(6)], bar Barton, Goode, Briggs, Manzo, and Sindelman

from participating in any offering of penny stock; and

## VII.

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2)

of the Exchange Act  [15 U.S.C. § 78 u(d)(2)], bar Barton, Briggs, Manzo, and Sindelman from

serving as an officer and director of a public company.

Dated:      January 25, 2017
            New York, New York

                          Respectfully submitted,

                          By: _____
                              Andrew M. Calamari
                              Lara Shalov Mehraban
                              Sandeep Satwalekar
                              Jack Kaufman
                              Bennett Ellenbogen
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE
                              COMMISSION
                              New York Regional Office
                              Brookfield Place
                              200 Vesey Street, Suite 400
                              New York, NY 10281-1022
                              (212) 336-0523 (Kaufman)